DeWitt Stern v. Eisenberg May it please the Court, Peter Bigging, Goldberg, Segala. I'm representing the appellant. This is a case involving claims for breach of contract, breach of fiduciary duties, tortious interference with the contract, and related claims based on an alleged breach of the common law prohibition against soliciting business relationships that have been sold to another, and breach of the non-solicitation provisions of an employment agreement. In the decision being appealed from, Judge Sweet reviewed a contract which stated, We are pleased to offer you the following terms in connection with your employment by the firm as a director and officer of our company, and the purchase of your present and future book of business related to the insurance business. Do you agree that at the time of that 2007 agreement, there was no present book of business? I agree that at the time of that entry into that agreement, Eisenberg had sold his business, his book of business in all goodwill, associated goodwill, to Aon, but he continued to operate, he continued to service those clients, and he continued to view that as his business, and he was selling both his present and his future book of business as it might develop. That was my question. He had no present book of business, did he? I mean, he had sold it, allegedly, to Aon. Yes. He either had sold it and he didn't have it, or at the very least it was under a serious cloud. Judge Sweet, does it make a difference? I don't think it makes a difference except for the fact that it was understood that to the extent, and there's testimony on this in the record, the COO of DeWitt who negotiated with him, to the extent that the business was capable of being purchased at that time, he was purchasing it, to the extent it was not capable of being purchased and it would have to be developed through DeWitt's conduct on his behalf to try and enforce, you know, to get him a release from that agreement, then they would be purchasing the future book of business, and both types of contracts are enforceable. What does future book of business mean? There's no definition in the agreement, is there? Right. The concept of a book of business, I think, is universally understood, at least in the insurance brokerage business, and certainly we could argue, I guess, if we had to try this case, we could argue whether that was universally understood, but a book of business is understood. The future book of business would be whatever book of business he would be able to develop in terms of the client relationships at DeWitt when he moved over to DeWitt. He was already with DeWitt, so it was DeWitt's. I mean, he didn't have some independent business that he was operating inside DeWitt. Well, no, he was at Aon and then on October 9, 2007. I'm trying to tease out future book of business. Yes. You're following up on that. Yeah, the future book of business would be the clients that he lawfully was able to bring to DeWitt, unaffected by any cloud, that DeWitt could continue to service and generate commissions from. Oh, it's not the clients that, well, he was, once he started with DeWitt, he then brought in. Yes, once he started at DeWitt, he then, what happens typically as a broker, in a broker situation is that you'll issue what's called a broker of record letter, and you'll send out and you'll say, this client now wants to use me as the broker. So the first day that he got into DeWitt, I believe he started sending out broker of record letters and solicited those clients to become clients of DeWitt. It was Aon. Future book of business? That would be the future. DeWitt's book of business once he brought them in. It wasn't lawful. Aon was taking the position, Aon litigated with DeWitt and Mr. Eisenberg, that it was his book of business and that DeWitt had no right to take it and that DeWitt would have to pay damages for all of the commissions that were lost as a result of that. So it was not DeWitt's book of business the moment he walked in the door. It became DeWitt's book of business once DeWitt was able to resolve the litigation with Aon by paying $425,000 to settle it and get a release. What was the consideration for the purchase of the present and future book of business? There was a significant variety of compensation in there. There was a $90,000 upfront bonus that was paid, and while it was not well articulated in the agreement. It wasn't articulated at all that it was a payment for the, quote, present and future book of business. Mr. Page, in a subsequent memo to the board, indicated that that's what he understood it to be. Additionally, there was other compensation. I mean, there was a significant amount of consideration that was paid. It was a new employee, and he was getting a lot of compensation. Yes, he was going to get compensation. He was also provided basically a million-dollar-a-year insurance policy where they agreed that to the extent the business could not successfully be transported to DeWitt, he would be paid a million dollars a year. So I think that that's also a substantial consideration. If he didn't actually succeed in bringing that business over, he would receive a million dollars a year. The other thing that's also interesting to note is it is not a well-drafted contract, and we wouldn't be here if it was a well-drafted contract, but I will point out that- Who drafted it? The COO, DeWitt. But he also drafted it, and Mr. Eisenberg had counsel, and they negotiated the terms for a significant period of time. And I will note that in addition to lack of detail about the allocation of the compensation, the consideration to be paid for the purchase of the business, there was also a provided that Mr. Eisenberg never had to show up at work. Mr. Eisenberg was not going to ever have to account for his time, and Mr. Eisenberg could take any employment that he wanted in any other profession, full-time, part-time, whatever he wanted to do, as long as it wasn't in the insurance business. Again, you may sit there and you may say, well, but boy, that's something the jury needs to tease out, and I would agree that perhaps that is. But I think that it's not something where you can look at this contract with that specific language in there and say, this clearly, unambiguously evidences no intent on the part of the parties that he sell his book of business. Why wasn't the ‑‑ why weren't the provisions of the 2007 agreement superseded by the 2012 agreement? The provisions ‑‑ well, there's a merger clause, but a merger clause only affects to supersede things if there's the same exact subject matter in both agreements. The 2007 agreement provisions with regard to ‑‑ It doesn't say that. It just says with respect to the subject matter hereof. And, in fact, it's a much more detailed and lengthy agreement than the 2007. It includes a noncompete, which suggests that it is addressing the same subject matter. It does to the extent ‑‑ it addresses the same subject matter to the extent it's addressing the terms and conditions of his employment. It does not address the purchase of the business. The other thing I ‑‑ A noncompete is related to the purchase of an agreement, because there's case law saying that you can't continue to solicit business and so on if you're old clients. So I'm not so convinced that it doesn't address. It's certainly related to the issue if you go ahead and compete in violation of it, but it's not the subject matter. This is a dual‑purpose agreement. Again, it's not the most beautifully crafted document, but it's a dual‑purpose agreement. It specifically says that it's both for the terms of his employment as a director and officer of the company and the purchase of your present and future book of business. And one point I want to make sure I get to is ‑‑ Before you get to it. Yes. What clients do you claim that Eisenberg actually solicited for Gallagher after he left DeWitt that he didn't have prior to his coming to DeWitt that were not historical clients of his before ever coming to DeWitt? Every ‑‑ no, every ‑‑ there's one client that was ‑‑ after Eisenberg moved over, but all the other clients, all clients that he had, he had serviced and sold to Aon and then with DeWitt's assistance was able to move them to DeWitt. With respect to new regency, is there any indication that he used any confidential information from DeWitt? Well, that gets to the issue of what confidential information is, Your Honor. The 2012 agreement expressly states that confidential information shall include the names of customers, the names of accounts, and the names of key account contacts as well as account characteristics. Now, Judge Sweetbelow stated that this could not be enforceable because if you bring business with you and relationships with you without any substantial assistance from your employer, the employer can't then claw them back with a non‑compete agreement. But in this instance, as you pointed out in your first question, all these relationships had been sold. He no longer had these relationships. You can say that historically ‑‑ I mean, you can't change the fact that he knew these people and historically he had worked with them, but as a matter of law, those relationships had been sold. He has an agreement that's part of the record that showed that he had sold all of his business and all of its goodwill to Aon, and he had entered into a non‑compete agreement that said he wouldn't be able to compete with them for three years. I don't know how he can then come in here and say, well, I didn't get any assistance from DeWitt in developing these clients as DeWitt. Even if you take the position that the 2007 agreement didn't serve to ‑‑ as a purchase of his business, you can't dispute the fact that he developed that business only with the substantial assistance of DeWitt, and we point it out again. Thank you, Mr. Bigging. You're well into your red light here, and you have reserved some time for rebuttal, so we're going to hear from Mr. DeMaria. May it please the Court, Carmen DeMaria from the firm of Ogletree, Deakins, Nash, Smoak, and Stewart for the appellee's defendants. It is our position that the exhaustive opinion of Judge Sweet below, in which he went through in great detail all the facts that were alleged by both sides, should be affirmed. Before I even get to my outline, I just wanted to address some of the things that were discussed during the appellant's argument. First of all, as Judge Cotto pointed out, all of the clients that Mr. Eisenberg took with him to Gallagher were clients that he had preexisting relationships with. With regard to New Regency, while it was a new client, the decision-maker was a decision-maker, Mr. Clausen, who he had known long before he ever went to DeWitt. With regard to this issue of the $1 million guarantee, it's in the record that that was taken out by Mr. Johnson from the agreement in a subsequent agreement. So that was no longer part of the 2007 agreement. As far as this notion that he never had to show up for work, I mean, he's being paid on a commission basis. And if you look at his agreement, it says, you will be responsible to produce insurance accounts on behalf of DSG. You will devote your efforts and skills as necessary to produce business. So to say that somehow he sold his business because he didn't have to show up for work is just belied by the record. But in terms of the 2007 agreement, which Appellant is clearly relying on, Judge Sweet, as a matter of law, could determine whether the agreement was ambiguous or not, and I would invite the Court to review the 2007 agreement. There is not a single term in that agreement which goes to discussing a sale of a business. Every term in that... It does refer to the purchase of a present and future book of business. One reference in the first line, Your Honor. But as this Court has held... How are we to treat that? Well, the way you treat it, Your Honor, is, as this Court has stated in Computer Systems, the intention of the parties must be gleaned from all corners of the document, rather from sentences or clauses viewed in isolation. What Appellant would have you do is review that one part of one sentence and say that he has sold his book of business. But when you look at the four corners of the document, there is no reference at all to him being a seller. There is no reference, as I believe the Judge pointed out, to any terms of the sale, including what the terms of a future sale would be. When you look at the compensation terms, he's called an employee when it discusses his compensation. And I think, very tellingly, the last sentence of the agreement right before Mr. Page's signature says, to accept the terms of employment offered herein, please sign this letter agreement below. This is clearly an employment agreement and not an agreement for the purchase of a book of business. What do you do with the email from Page to Eisenberg, October 3, 2007, which said the purchase of your business was an essential element of the agreement? Well, Your Honor, again, I think that when you look at the four corners of the whole agreement, it's inconsistent with an argument that the agreement has to do with the sale of business. Not only that, when you look at the other extrinsic evidence, including the appellant's own witness's testimony, it's inconsistent with that statement. For example, the COO, Charles Johnson, whose testimony that they rely upon, states that there was no sale of a book of business on October 9, 2007, which is the date of the agreement. He was asked, Is it your position that Richard's business was purchased as of 10-9, 2007? Yes or no? Answer, no. Then when was it purchased for the first time? Answer, over the course of time. So we have one COO saying that the 2007 agreement is an agreement for the purchase of a book of business, and we have the other COO saying, Well, no, the business wasn't purchased at that time. It was purchased over time. So I think that when you look at the four corners of the document, as well as the extrinsic evidence, and I mean we haven't even discussed yet the fact that in their original complaint and in their original brief in support of their application for a temporary restraining order, they didn't say that the 2007 agreement was a purchase agreement. They specifically said that it was an employment agreement. If you turn to Essay 6, it says, In order to memorialize and confirm the understandings and agreements entered into between DeWitt and Eisenberg with respect to his employment for the company and to protect itself in the event of future disputes, DeWitt and Eisenberg signed a series of employment agreements with the company, including his final agreement executed by Eisenberg on October 9, 2012, the third such agreement during his term with DeWitt. So they characterized it themselves as an employment agreement when the case first started. When they made a sanctions motion, then they switched their position. Their position was then, well, he didn't have a book of business to sell because he had already sold it to Aon. Well, how could he have a 2007 agreement where he is selling a book of business if he didn't have a book of business to sell? I think that that is really the nub of the issue, is that no reasonable juror hearing all of their own testimony and reviewing their own pleadings could ever make a determination that there was a sale of a book of business. But even if you did, even if you did make that determination, by its own terms, the 2007 agreement expires after five years. That's what it states. And Mr. Page, whose testimony that they rely on, says, we are both committing for five years. So after five years, the agreement expires, and then they enter into this 2012 agreement, which Your Honor pointed out contains a non-compete provision. Not only that, but the agreement is superseded by the 2012 agreement. What's the best evidence of that? Again, their own pleading and their own briefs where they said, they said that the 2007 agreement was superseded by the 2012 agreement. Not only that, but I think it meets all of the other characteristics that you need in order for one agreement to supersede the other. It specifically had an integration clause. It dealt with the same subject matter, which was his employment. And they couldn't be read in tandem because one agreement expired, and there were different terms of employment in the two agreements. So the one agreement did supersede the other. So now let's go to the next step of the analysis. The 2012 agreement, was that agreement violated by Mr. Eisenberg? And I would say for two reasons it wasn't. First of all, as Judge Sweet correctly pointed out, under New York law, when an employee brings relationships with him to a business, then the employer doesn't have a legitimate business interest, such as is talked about in BDO-Sideman and that line of cases. It's only when he acquires those relationships while he's there that the employer has a legitimate interest in preventing him from soliciting that business going forward. And their own witnesses testified, and it's undisputed, that Mr. Eisenberg had all of these relationships long before he ever came to DeWitt. The second reason it's unenforceable is there is no DeWitt confidential information here. Mr. Eisenberg had all of these relationships, again, undisputed, from their own witnesses' testimony. He had all of these relationships and brought them to DeWitt. Just to put it in an agreement and call it confidential information, when he is the one who brings the relationships, it just doesn't make sense and it's inconsistent with the law. So for all of those reasons, Your Honors, I respectfully submit that the decision of the district court should be affirmed, unless you have any other questions. Thank you, Mr. DiMaria. Mr. Biggie? Thank you, Judge Holmes. You deserve two minutes. Let me try to cover all that ground as quickly as possible. As Judge Carney pointed out, the contract specifically has language in it that says that it's for the purchase of your present and future book of business. There's a case that we cite, Riverside South Planning Corp. v. CRP Extel Riverside LP, New York State Court of Appeals decision. New York State law applies here. It says, courts may not by construction, add, or excise terms nor distort the meaning of those used and thereby make a new contract for the parties under the guise interpreting the writing. I just don't believe that Judge Sweet had a right to ignore that language. The only thing he could have done was he could have said, well, this is confusing to me. This is really ambiguous because there's all this other stuff in there that I don't see that I should expect to see. He didn't ignore it. He discussed it. Well, he first concluded that as a matter of interpretation, this contract can only be concluded to be an employment agreement. He made that determination.  And then when he went into the ambiguity analysis, he said, I see that DeWitt has submitted email communications between Mr. Page and Mr. Eisenberg, in which Mr. Page sent a contract with the purchase language in there. Mr. Eisenberg deleted it. And then Mr. Page sent it back again and said, I've reinserted that language because it's an essential element of our agreement. In that same email, he said, I also have made this contract only terminable by cause for each of us. Otherwise, we wouldn't have much of a sale here. Now, if you're with me that he can't, Judge Sweet could not have, as a matter of law, just ignored that language, that the most he could have done was concluded it was ambiguous, then you've got to look at the email communications. And Mr. and, I'm sorry, the email communications are probably the best evidence of their intent. And what's really, I think, most important to point out as well is that, I'm sorry, I'm losing my train of thought. Judge Sweet said that, determined that he could place no value on that extrinsic evidence. By doing that, he basically assumed the obligation of the jury, the jury is the fact finder, to determine the weight of the evidence. If you would permit me to go over just cover two or three more additional things that were brought up, I'd appreciate it. We have one minute. Okay, thank you, Your Honor. There's no authority that was cited for the conclusion that a sale of a business sunsets because the term of employment associated with that sunsets. So the argument that the sale was only a five-year sale and then it reverts back to him, I don't know where that's coming from. There's no case law that's cited for that. And the authority for enforceability, I just want to, the last thing I want to say is that this, we have cited authority on page nine of our reply brief that addresses the fact that contracts for the sale of future rights and future business are enforceable. That's on page nine of our reply brief. And I would say that this is also, I would also alert the court's attention to what are referred to as requirements contracts. Often buyers of goods and materials will enter into contracts where they'll say, I can't tell you how much I'm going to need so we can't figure out the amount and we can't figure out the total cost. But you'll supply me whatever I need for my requirements. This is, that could arguably be said to be an unenforceable contract, but it's not. The courts have regularly enforced those contracts. This is a similar type of contract where it was said, whatever business you ultimately develop going forward, that's going to be DeWitt Stern's business. And again, there was substantial compensation, consideration paid for that. Is there contention that that obligation, that right to control Mr. Eisenberg's future business continued past the five year period? Yes. Yes. And in fact, there was a- Forever. No, no, no. There was a, yes, well, there was a, in the 2012 agreement, he was prohibited from making use of the names and the account information and the client contacts for a period of two years after the termination of his employment. Thank you, Mr. Benjamin. Thank you, Your Honor. Thank you, Mr. DiMaria. Thank you both. Reserved decision. And you guys, too, have safe travels back north. The final case on the calendar is, excuse me, Diabi v. Sessions, and that's on submission, so I will ask the clerk, please, to adjourn the court. Court is adjourned.